☑ Original ☐ Duplicate Original

# UNITED STATES DISTRICT COURT

for the

Eastern District of Wisconsin

| | | |
|---|---|---|
| In the Matter of the Search of<br>*(Briefly describe the property to be searched or identify the person by name and address)*<br>information associated with a certain cellular telephone assigned the call number 414-218-6367 (Target Cell Phone), that is stored at premises controlled by AT&T Wireless, a wireless telephone service provider headquartered at 11760 US Hwy 1, North Palm Beach, FL 33408 | ) | Case No. 26-840M(NJ) |

## WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

To: Any authorized law enforcement officer

An application by a federal law enforcement officer or an attorney for the government requests the search and seizure of the following person or property located in the ____________ District of ____________
*(identify the person or describe the property to be searched and give its location)*:

Please see Attachment A.

I find that the affidavit(s), or any recorded testimony, establish probable cause to search and seize the person or property described above, and that such search will reveal *(identify the person or describe the property to be seized)*:

Please see Attachment B.

**YOU ARE COMMANDED** to execute this warrant on or before 2/6/2026 *(not to exceed 14 days)*

☐ in the daytime 6:00 a.m. to 10:00 p.m. ☒ at any time in the day or night because good cause has been established.

Unless delayed notice is authorized below, you must give a copy of the warrant and a receipt for the property taken to the person from whom, or from whose premises, the property was taken, or leave the copy and receipt at the place where the property was taken.

The officer executing this warrant, or an officer present during the execution of the warrant, must prepare an inventory as required by law and promptly return this warrant and inventory to Honorable Nancy Joseph .
*(United States Magistrate Judge)*

☐ Pursuant to 18 U.S.C. § 3103a(b), I find that immediate notification may have an adverse result listed in 18 U.S.C. § 2705 (except for delay of trial), and authorize the officer executing this warrant to delay notice to the person who, or whose property, will be searched or seized *(check the appropriate box)*

☐ for _____ days *(not to exceed 30)* ☐ until, the facts justifying, the later specific date of ____________ .

Date and time issued: 1/23/2026 @ 10:53 a.m.

*Judge's signature*

City and state: Milwaukee, WI

Honorable Nancy Joseph, U.S. Magistrate Judge
*Printed name and title*

## Return

| Case No.: | Date and time warrant executed: | Copy of warrant and inventory left with: |
|---|---|---|
| Inventory made in the presence of : | | |
| Inventory of the property taken and name(s) of any person(s) seized: | | |

## Certification

I declare under penalty of perjury that this inventory is correct and was returned along with the original warrant to the designated judge.

Date: ____________________

____________________
*Executing officer's signature*

____________________
*Printed name and title*

# ATTACHMENT A

## Property to Be Searched

This warrant applies to records and information associated with the cellular telephone assigned call number 414-218-6367 (“the Target Cell Phone”), that is stored at premises controlled by AT&T Wireless (“the Provider”), a wireless telephone service provider headquartered at 11760 US Hwy 1, North Palm Beach, FL 33408.

## ATTACHMENT B

### Particular Things to be Seized

### I. Information to be Disclosed by the Provider

To the extent that the information described in Attachment A is within the possession, custody, or control of the Provider, including any information that has been deleted but is still available to the Provider or that has been preserved pursuant to a request made under 18 U.S.C. § 2703(f), the Provider is required to disclose to the government the following information pertaining to the Account listed in Attachment A for the time period from January 1, 2026, through January 12, 2026:

a. The following information about the customers or subscribers of the Account:

   i. Names (including subscriber names, usernames, and screen names);

   ii. Addresses (including mailing addresses, residential addresses, business addresses, and e-mail addresses);

   iii. Local and long-distance telephone connection records;

   iv. Records of session times and durations, and the temporarily assigned network addresses (such as Internet Protocol ("IP") addresses) associated with those sessions;

   v. Length of service (including start date) and types of service utilized;

   vi. Telephone or instrument numbers (including MAC addresses, Electronic Serial Numbers ("ESN"), Mobile Electronic Identity Numbers ("MEIN"), Mobile Equipment Identifier ("MEID"); Mobile Identification Number ("MIN"), Subscriber Identity Modules ("SIM"), Mobile Subscriber Integrated Services Digital Network Number ("MSISDN"); International Mobile Subscriber Identity Identifiers ("IMSI"), or International Mobile Equipment Identities ("IMEI");

   vii. Other subscriber numbers or identities (including the registration Internet Protocol ("IP") address); and

viii. Means and source of payment for such service (including any credit card or bank account number) and billing records.

b. All records and other information (not including the contents of communications) relating to wire and electronic communications sent or received by the Account, including:

i. the date and time of the communication, the method of the communication, and the source and destination of the communication (such as the source and destination telephone numbers (call detail records), email addresses, and IP addresses);

ii. information regarding the cell tower and antenna face (also known as “sectors”) through which the communications were sent and received, including the locations of any cell tower and antenna face; and

iii. fGhistorical location records (including historical locational precision information, historical handset location data, estimated location records, geolocation information (PING), Network Event Location System (NELOS) data, Global Positioning System (GPS) data, cell tower triangulation or trilateration, round-trip time (RTT), per-call measurement data (PCMD), historical E911 data, or precision measurement information).

c. A list of definitions or keys identifying all information contained in the records.

**II. Information to be Seized by the Government**

All information described above in Section I that constitutes fruits, evidence, and instrumentalities of violations of arson of commercial property, in violation of Title 18, United States Code, Section 844(i), during the period from January 1, 2026, through January 12, 2026.

Law enforcement personnel (who may include, in addition to law enforcement officers and agents, attorneys for the government, attorney support staff, agency personnel assisting the government in this investigation, and outside technical experts under government control) are authorized to review the records produced by the Provider in order to locate the things particularly described in this Warrant.

# UNITED STATES DISTRICT COURT

for the

Eastern District of Wisconsin

In the Matter of the Search of
*(Briefly describe the property to be searched or identify the person by name and address)*

information associated with a certain cellular telephone assigned the call number 414-218-6367 (Target Cell Phone), that is stored at premises controlled by AT&T Wireless, a wireless telephone service provider headquartered at 11760 US Hwy 1, North Palm Beach, FL 33408

Case No. 26-840M(NJ)

## APPLICATION FOR A WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

Please see Attachment A.

located in the ____________ District of ____________, there is now concealed *(identify the person or describe the property to be seized)*:

Please see Attachment B.

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

- ☑ evidence of a crime;
- ☐ contraband, fruits of crime, or other items illegally possessed;
- ☐ property designed for use, intended for use, or used in committing a crime;
- ☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| *Code Section* | *Offense Description* |
|---|---|
| 18 U.S.C. § 844(i) | Arson |

The application is based on these facts:

Please see Affidavit.

☑ Continued on the attached sheet.

☐ Delayed notice of _____ days *(give exact ending date if more than 30 days:* __________ *)* is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

Digitally signed by LUKE BARKER
Date: 2026.01.22 13:19:21 -06'00'

*Applicant's signature*

Luke Barker, Special Agent - ATF

*Printed name and title*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by telephone *(specify reliable electronic means)*.

Date: 1/23/2026

*Judge's signature*

City and state: Milwaukee, WI

Honorable Nancy Joseph, U.S. Magistrate Judge

*Printed name and title*

**AFFIDAVIT IN SUPPORT OF**
**AN APPLICATION FOR A SEARCH WARRANT**

I, Luke Barker, being first duly sworn, hereby depose and state as follows:

## INTRODUCTION AND AGENT BACKGROUND

1. I make this affidavit in support of an application for a search warrant for information associated with a certain cellular telephone assigned the call number **414-218-6367**, or the **Target Cell Phone**, that is stored at premises controlled by AT&T Wireless, a wireless telephone service provider headquartered at 11760 US Hwy 1, North Palm Beach, FL 33408. The information to be searched is described in the following paragraphs and in Attachment A. This affidavit is made in support of an application for a search warrant under 18 U.S.C. § 2703(c)(1)(A) to require AT&T Wireless to disclose to the government copies of the information further described in Section I of Attachment B. Upon receipt of the information described in Section I of Attachment B, government-authorized persons will review the information to locate items described in Section II of Attachment B.

2. I am a Special Agent of the U.S. Department of Justice's Bureau of Alcohol, Tobacco, Firearms and Explosives (ATF), currently assigned to the Milwaukee Field Office. I have been so employed since November 2015. My duties as a Special Agent with the ATF include investigating alleged violations of the federal firearms, explosives, and arson statutes.

3. I have completed approximately 26 weeks of training at the Federal Law Enforcement Training Center in Glynco, Georgia. I have also completed training at the ATF National Academy. That training included various legal courses related to constitutional law, search and seizure authority, and specific training on explosives and arson investigations. Additionally, I have received training on how to conduct various tasks associated with criminal

investigations, such as interviewing, surveillance, and evidence collection. As a Special Agent with the ATF, I have responded to numerous fire scenes and been involved in multiple arson investigations. I have also received additional fire investigation training, including training at the Wisconsin International Association of Arson Investigators' 2019 annual conference. Before joining the ATF, I served for nearly eight years as a police officer with the Aurora Police Department in Aurora, Colorado.

4. Through my experience and training as a firearm and arson investigator, I am aware that electronic devices, such as cellphones, are used to store and save audio, video, and text files that can link to a variety of criminal activity. These electronic devices often contain evidence about the custody and control of those devices, along with location information about the device's whereabouts at the time of the crime. During the course of my investigations, I have regularly used electronic evidence relating to the commission of criminal offenses, including intent, motive, manner, means, and the identity of co-conspirators.

5. I am an investigative or law enforcement officer of the United States within the meaning of Section 2510(7) of Title 18, United States Code, in that I am empowered by law to conduct investigations of and to make arrests for federal offenses.

6. The facts in this affidavit come from my personal observations, my training and experience, and information obtained from other agents and witnesses. This affidavit is also based upon information gathered from interviews of citizen witnesses, reports, official records, law enforcement reports, and information provided to me by other federal, state, and local law enforcement officers. This affidavit is intended to show simply that there is sufficient probable cause for the requested warrant and does not set forth all of my knowledge about this matter.

7. Based on my training and experience and the facts as set forth in this affidavit, there is probable cause to believe that violations of Title 18 United State Code § Section 844(i), arson of a commercial property, has been committed by Dante Deleon BRACEY. There is also probable cause to search the information described in Attachment A for evidence of these crimes, as described in Attachment B.

## PROBABLE CAUSE

### May 25, 2025, Fire

8. On May 25, 2025, at approximately 8:21 p.m., Milwaukee Fire Department (MFD) and Milwaukee Police Department (MPD) were dispatched to 3069 N. Sherman Blvd, Milwaukee, WI for a report of a Fire as well as a subject with a weapon.

9. Upon the arrival of MFD and MPD, the fire had already been extinguished. MPD Officers Kyle Kloety and Rafael Villagomez met with the reporting party, A.B. A.B. informed Officers Kloety and Villagomez that her boyfriend, Dante BRACEY (B/M DOB: 11/29/1990) had been in front of her residence since approximately 7:40 p.m. and was sending her threatening messages.

10. A.B. stated at approximately 7:40 p.m. she observed BRACEY's vehicle, a Silver in color Pontiac Grand Am with a loud exhaust, outside of her residence. A.B. said that at about the same time she began receiving phone calls and text messages from BRACEY about him being outside her residence (*See Figure #1)*. A.B. said she ignored the messages, but that BRACEY began to become more aggressive, to include sending messages about threatening to shoot her (*See Figure #2)*.




*Figure #1*




*Figure #2*

11. A.B. consented to Officers taking a photograph of the messages. In the photograph, the messages are sent from phone number 414-372-6199. Your affiant was able to view the screenshots the Officers took of the messages received by A.B. After receiving messages about being outside and referencing a shooting in her living room, A.B. received additional messages from the same phone number. One of the messages stated, "The bed facing the window" followed by a text message with the images of a skull and crossbones (*See Figure #3)*. Afterwards, the same numbers sent more text messages to include, "Outside" and "outside" and "I'm literally outside" (*See Figure #4).* Later in the interview, Officers asked A.B. BRACEY's phone number and she informed them it is 414-372-6199.




*Figure #3*




*Figure #4*

12. A.B. informed Officers that at approximately 9:25 p.m. she began to smell what she believed to be incense from her bedroom window. A.B. stated she then discovered the board that was covering her bedroom window had an orange glow to it. A.B. said she then called the Fire Department. A.B. added when she heard sirens responding she heard BRACEY's vehicle drive away.

13. MPD Officer Kloety observed the bedroom window that A.B. had referenced (*See Figure #5*). Officer Kloety noted that the window was covered by a sheet of plywood and had two holes in the wood. The southernmost hole was charred and with a melted substance (*See Figure #6*). Officers responded to BRACEY's last known address but were unable to locate him.



*Figure #5*



*Figure #6*

**January 10, 2026, Fire**

14. On January 10, 2026, at approximately 10:23 p.m., the MFD were dispatched to 3069 N. Sherman Blvd, Milwaukee, Wisconsin, on a report of a fire. Once on scene, MFD Engine 13 reported that the fire had been extinguished prior to their arrival. The fire was located in the basement and damaged part of the wooden frame as well as a blue tricycle scooter for kids - $50, a collapsible shopping cart - $50, a drum set - $100, a blue adult

bicycle - $200, a white adult bicycle - $200 and the blue Lowe's 5-gallon bucket - $10. (*see Figure #1*). The damaged wooden frame was part of a two-story, multi-unit rental property.



*Figure #1*

15. MFD requested MPD assistance based on their belief that it was an intentionally set fire.

16. Upon their arrival MPD Detective John Kohlrt interviewed one of the victims, L.E., who lives in first floor apartment, Unit #B. L.E. stated he lives in the apartment with A.B., the mother of his child, although he and A.B. have not been in a romantic relationship for ten (10) years.

17. L.E. told investigators that he was in the living room with his children watching television when he smelled smoke. A short while later, he observed a small amount of smoke coming out of the vents in the living room. L.E. stated he went down to the

basement to see where the smoke was coming from. L.E. said that he could see an orange glow coming from the basement while standing at the top of the stairs that led down. L.E. then alerted his neighbor. L.E. and his neighbor went to the basement where L.E. observed flames coming out of a Lowe's five-gallon plastic bucket. L.E. stated he observed other items on fire as well. L.E. stated his neighbor used a garden hose that was attached to the basement sink and extinguished the fire. Once the fire was out, L.E. stated he took the Lowe's bucket out to his backyard (*see Figure #2*).



*Figure #2*

18. MPD Detective Johnathon Gleesing interviewed another victim, A.B. A.B. informed detectives that she lives in the apartment with the father of her child, L.E., however they are no longer in a relationship. A.B. said he is currently dating BRACEY and has been doing so, on and off, for approximately five years.

19. A.B. informed detectives that the previous night, January 9, 2026, she had stayed with BRACEY at his residence, located at 2331 S. 15th Street in Milwaukee. A.B. said she left around 4:00 am to go to work. A.B. stated in the afternoon of January 10, 2026, she began receiving multiple phones calls from BRACEY from two separate phones. Some of the calls were from BRACEY's current phone number 414-218-6367 and some of the calls were

from a private number. A.B. said she answered calls from both phones and recognized the caller as BRACEY.

20. A.B. informed detectives that she received multiple calls from BRACEY, but she only answered a few of them. A.B. said BRACEY was arguing with her and accusing her of going home and having sex with L.E. instead of going to work. A.B. stated in addition to the phone calls she received multiple text messages from BRACEY. A.B. said that BRACEY repeatedly told her via phone and text that he was outside her residence. A.B. gave MPD detectives consent to take screen shots of some of the text messages she received from BRACEY. In a message sent at approximately 7:36 p.m. on January 10, 2026, BRACEY texted, "I see you" and "I'm here" and "I see you're too laying down together I see him down here laying in the living room together I see the girls in the room" *(see Figure #3)*.




*Figure #3*

21. A.B. stated she called the police at approximately 7:43 p.m. on January 10, 2026, and made a complaint that someone was banging on her window and refusing to leave. It should be noted that MPD officers responded to the area but did not come in contact with anyone. A.B. said she continued to receive text messages from BRACEY until approximately 8:12 p.m. and phone calls from BRACEY until 9:41 p.m.

22. A.B. stated she was in her apartment a short while after 10:00 p.m. when she started to smell smoke and then began to see smoke coming through the vents in their floor. A.B. said L.E. and some of their neighbors went to the basement where they located and ultimately extinguished the fire.

23. MPD Detective Johnathon Gleesing and John Kohler also conducted an interview with C.G., who lives in Unit #D, on the second floor of the apartment building. C.G. informed MPD detectives she has surveillance cameras on the exterior of her apartment door as well as cameras in the front and back of the house. C.G. checked the exterior cameras and informed detectives she observed a subject appeared to be leaving from the back of the building (*See Figure #4)*. The time stamp of this video was approximately 10:24 p.m. on January 10, 2026.




*Figure #4*

24. On January 11, 2026, in addition to conducting interviews, MPD Detective Gleesing conducted an examination of the fire scene. Detective Gleesing noted, “In the area around the charred debris there did not appear to be any possible ignition sources. I did not observe any electrical or mechanical ignition sources, exposed wires, or objects capable of spontaneous combustion. I did not observe any means that a fire could have started without human action.”

25. On January 15, 2026, MPD Detectives Gleesing and Maxwell Ours conducted a custodial interview with BRACEY. After being informed of his rights, BRACEY agreed to answer questions. BRACEY stated he and A.B. have been in a relationship for about five years. BRACEY said he and A.B. had never had issues up until the father of A.B.’s child (L.E.) moved in with her. BRACEY informed Det. Gleesing that he was at A.B.’s residence on January 10, 2026. BRACEY stated he had knocked on the side window to be let in to her apartment. BRACEY said A.B. would not let him in and told him she was going to call the police. BRACEY stated he then left the area at approximately 8:00 p.m. on a city bus.

26. When asked if he returned to the area of her residence at all on January 10, 2026, BRACEY stated he did not. Detective Gleesing informed BRACEY he had seen text messages on A.B.'s phone from him stating that he was back at her residence. BRACEY said he says things like that to "mess with [A.B.]." BRACEY added that when he took the city bus, he used his bus app. BRACEY stated his bus app is attached to his phone number and provided number 414-218-6367. BRACEY told Detective Gleesing that the bus app would show that he did not come back to the location of A.B.'s residence. BRACEY consented to detectives looking at his phone and going through his bus app.

27. BRACEY admitted to Detective Gleesing that he has two phones. BRACEY stated he uses one for communication and the other he only uses to listen to music.

28. BRACEY told detectives he was not at A.B.'s residence during the fire. BRACEY admitted to being at A.B.'s residence earlier in the day, but stated he did not go back.

29. MPD Detective Michael Martin conducted follow-up with the bus app information that BRACEY gave to detectives. Detective Martin was able to obtain bus ride information linked to BRACEY's phone number, 414-218-6367, for the date of January 10, 2026. Detective Walters was able to discover that on January 10, 2026, the phone number attached to BRACEY's bus app was used to enter a bus at approximately 10:31 p.m. at the Burleigh and N. 45th St bus stop. This bus stop is only two blocks west of the scene of the fire.

30. On January 15, 2026, MPD Detective Keith Miller conducted a follow up interview with A.B. During this interview, A.B. stated she did not believe her boyfriend, BRACEY, was the person that set her property on fire. A.B. said it would not have been

possible for BRACEY to enter the apartment building because he did not have a key to the building, nor did he know that anyone resided in the building. A.B. stated the day after the fire she overheard some people in the apartment building hallway talking about the fire and how it wasn't necessary for the fire department to be involved. A.B. stated she does not see the people nor recognize their voice but believes they may have been involved with starting the fire.

31. On January 16, 2026, MPD Detectives Ours and Gustavo Gonzales conducted a follow-up custodial interview with BRACEY. During the interview Detective Ours showed BRACEY a still photograph from the recovered video recording. BRACEY told detectives that was him walking towards the back of the residence to knock on the window. Detectives informed BRACEY that video was taken just before the fire was reported and asked him what he was doing at that time. BRACEY paused for a long time. Later on in the interview, BRACEY again denied setting the fire and said he was just there to talk to A.B. BRACEY informed detectives that he was under the influence of Adderall, muscle relaxers and alcohol that night and doesn't recall starting the fire. Later in the interview, detectives asked BRACEY what he did remember. BRACEY said he remembered getting off of the bus and walking to the back of A.B.'s residence. BRACEY added he knocked on a number of windows, heard someone say something about calling the police. BRACEY said he jumped over the fence after hearing sirens and then got on the bus.

32. Later in the interview, BRACEY admitted to the detectives that, "He did it" and that the detectives, "had probable cause that he did it." Detective Ours told BRACEY that he did not want him to admit to something he did not remember. BRACEY stated he did not

remember doing it. Approximately three minutes later in the interview, after observing some photographs provided by the detectives, BRACEY stated, "things were coming back to him." BRACEY said, "I had some tissue. I had a piece of tissue." BRACEY picked up the scene photographs and said, "You aint going to see it." BRACEY added, "I had a piece of tissue, a little thick piece of tissue, struck it, threw it in the bucket, and ran outside, and jumped the fence." Detective Ours asked BRACEY what he was trying to do. BRACEY informed them that her was trying to get A.B.'s attention and to get her to come outside. BRACEY went on to add that he just wanted to talk to A.B., which is why he went over to her residence twice that night. BRACEY stated he entered the building through an unlocked door in the basement.

33. Detective Ours also asked BRACEY about the fire that occurred at the same residence on May 25, 2025. BRACEY informed detectives he did not go to A.B.'s house that day. BRACEY then explained that he was at A.B.'s house earlier in the day but left and was not there during the time of the fire.

34. Detective Ours asked BRACEY about the text messages he sent to A.B. to threaten to shoot her. BRACEY admitted "he might say something like that while he was angry." BRACEY admitted he has anger management issues and that he "blows off steam by acting in a threatening manner." BRACEY stated he loves A.B. and would never act on any threats. BRACEY again denied that he had anything to do with the fire on May 25, 2025, and said he was not at A.B.'s residence during the time of the fire.

35. Based upon my training, experience, and familiarity with this investigation, I believe that the requested records are likely to constitute evidence of the crimes under investigation because the location data for BRACEY's phone—the **Target Cell Phone**—is

likely to place the **Target Cell Phone** at and/or near the various crime scene locations at and around the time each arson was committed.

**<u>TECHNICAL BACKGROUND</u>**

36. Based on my training and experience, I know that cellular telephone providers can collect historical and prospective cell-site data and historical and prospective E-911 Phase II data about the location of the cellular telephones to which they provide service, including by initiating a signal to determine the location of the cellular telephone on cellular telephone provider networks or with such other reference points as may be reasonably available.

**<u>CELL-SITE DATA</u>**

37. In my training and experience, I have learned that cellular telephone providers are companies that provides cellular telephone access to the general public. I also know that providers of cellular telephone service have technical capabilities that allow them to collect and generate information about the locations of the cellular telephones to which they provide service, including cell-site data, also known as "tower/face information" or "cell tower/sector records." Cell-site data identifies the "cell towers" (i.e., antenna towers covering specific geographic areas) that received a radio signal from the cellular telephone and, in some cases, the "sector" (i.e., faces of the towers) to which the telephone connected. These towers are often a half mile or more apart, even in urban areas, and can be 10 or more miles apart in rural areas. Furthermore, the tower closest to a wireless device does not necessarily serve every call made to or from that device. Accordingly, cell-site data provides an approximate location of the cellular telephone but is typically less precise than other types of location information, such as E-911 Phase II data or Global Positioning Device ("GPS") data.

38. Based on my training and experience, I know that for each communication a cellular device makes, its wireless service provider can typically determine: (1) the date and time of the communication; (2) the telephone numbers involved, if any; (3) the cell tower to which the customer connected at the beginning of the communication; (4) the cell tower to which the customer was connected at the end of the communication; and (5) the duration of the communication.

39. Based on my training and experience, I know that cellular telephone providers can collect cell-site data about the cellular telephones using its network. I also know that wireless providers typically collect and retain cell-site and other cellular network data pertaining to cellular phones to which they provide service in their normal course of business in order to use this information for various business-related purposes. From this data, wireless providers can also estimate the historical locations of cellular telephones using their networks. These estimates are drawn from data collected in the normal course of business, including cell-site and other cellular network data. I served AT&T Wireless with a preservation request for the requested data on or about January 20, 2026. AT&T Wireless was the assigned wholesale customer provider for the **Target Cell Phone.**

**E-911 Phase II / GPS Location Data**

40. I know that some providers of cellular telephone service, have technical capabilities that allow them to collect and generate E-911 Phase II data, also known as GPS data or latitude-longitude data. E-911 Phase II data provides relatively precise location information about the cellular telephone itself, either via GPS tracking technology built into the phone or by triangulating on the device's signal using data from several of the provider's cell towers. I also

know that certain wireless providers can provide precision location information, also known as estimated location records or historical handset location data, on both a historical and prospective basis. Each provider refers to its proprietary estimates of a cellular device's location differently. This information, however, is sometimes referred to as geolocation information (PING), Network Event Location System (NELOS) data, Global Positioning System (GPS) data, cell tower triangulation or trilateration, round-trip time or real-time tool (RTT), per-call measurement data (PCMD), historical E911 data, or precision measurement information.

**PEN-TRAP DATA**

41. Based on my training and experience, I know each cellular device has one or more unique identifiers embedded inside it. Depending on the cellular network and the device, the embedded unique identifiers for a cellular device could take several different forms, including an Electronic Serial Number ("ESN"), a Mobile Electronic Identity Number ("MEIN"), a Mobile Identification Number ("MIN"), a Subscriber Identity Module ("SIM"), a Mobile Subscriber Integrated Services Digital Network Number ("MSISDN"), an International Mobile Subscriber Identity ("IMSI"), or an International Mobile Equipment Identity ("IMEI"). The unique identifiers – as transmitted from a cellular device to a cellular antenna or tower – can be recorded by pen-trap devices and indicate the identity of the cellular device making the communication without revealing the communication's content.

**SUBSCRIBER INFORMATION**

42. Based on my training and experience, I know that wireless providers typically collect and retain information about their subscribers in their normal course of business. This information can include basic personal information about the subscriber, such as name and

address, and the methods of payment (such as credit card account number) provided by the subscriber to pay for wireless telephone service. I also know that wireless providers typically collect and retain information about their subscribers' use of the wireless service, such as records about calls or other communications sent or received by a particular phone and other transactional records, in their normal course of business. In my training and experience, this information may constitute evidence of the crimes under investigation because the information can be used to identify the Target Cell Phone's user or users and may assist in the identification of co-conspirators and/or victims.

**AUTHORIZATION REQUEST**

43. Based on the foregoing, I request that the Court issue the proposed search warrant, pursuant to 18 U.S.C. § 2703(c) and Federal Rule of Criminal Procedure 41.

44. I further request that the Court direct AT&T Wireless to disclose to the government any information described in Section I of Attachment B that is within its possession, custody, or control. Because the warrant will be served on AT&T Wireless, who will then compile the requested records at a time convenient to it, reasonable cause exists to permit the execution of the requested warrant at any time in the day or night.

## ATTACHMENT A

**Property to Be Searched**

This warrant applies to records and information associated with the cellular telephone assigned call number 414-218-6367 ("the Target Cell Phone"), that is stored at premises controlled by AT&T Wireless ("the Provider"), a wireless telephone service provider headquartered at 11760 US Hwy 1, North Palm Beach, FL 33408.

## ATTACHMENT B

### Particular Things to be Seized

**I. Information to be Disclosed by the Provider**

To the extent that the information described in Attachment A is within the possession, custody, or control of the Provider, including any information that has been deleted but is still available to the Provider or that has been preserved pursuant to a request made under 18 U.S.C. § 2703(f), the Provider is required to disclose to the government the following information pertaining to the Account listed in Attachment A for the time period from January 1, 2026, through January 12, 2026:

a. The following information about the customers or subscribers of the Account:

   i. Names (including subscriber names, usernames, and screen names);

   ii. Addresses (including mailing addresses, residential addresses, business addresses, and e-mail addresses);

   iii. Local and long-distance telephone connection records;

   iv. Records of session times and durations, and the temporarily assigned network addresses (such as Internet Protocol ("IP") addresses) associated with those sessions;

   v. Length of service (including start date) and types of service utilized;

   vi. Telephone or instrument numbers (including MAC addresses, Electronic Serial Numbers ("ESN"), Mobile Electronic Identity Numbers ("MEIN"), Mobile Equipment Identifier ("MEID"); Mobile Identification Number ("MIN"), Subscriber Identity Modules ("SIM"), Mobile Subscriber Integrated Services Digital Network Number ("MSISDN"); International Mobile Subscriber Identity Identifiers ("IMSI"), or International Mobile Equipment Identities ("IMEI");

   vii. Other subscriber numbers or identities (including the registration Internet Protocol ("IP") address); and

viii. Means and source of payment for such service (including any credit card or bank account number) and billing records.

b. All records and other information (not including the contents of communications) relating to wire and electronic communications sent or received by the Account, including:

i. the date and time of the communication, the method of the communication, and the source and destination of the communication (such as the source and destination telephone numbers (call detail records), email addresses, and IP addresses);

ii. information regarding the cell tower and antenna face (also known as "sectors") through which the communications were sent and received, including the locations of any cell tower and antenna face; and

iii. fGhistorical location records (including historical locational precision information, historical handset location data, estimated location records, geolocation information (PING), Network Event Location System (NELOS) data, Global Positioning System (GPS) data, cell tower triangulation or trilateration, round-trip time (RTT), per-call measurement data (PCMD), historical E911 data, or precision measurement information).

c. A list of definitions or keys identifying all information contained in the records.

**II. Information to be Seized by the Government**

All information described above in Section I that constitutes fruits, evidence, and instrumentalities of violations of arson of commercial property, in violation of Title 18, United States Code, Section 844(i), during the period from January 1, 2026, through January 12, 2026.

Law enforcement personnel (who may include, in addition to law enforcement officers and agents, attorneys for the government, attorney support staff, agency personnel assisting the government in this investigation, and outside technical experts under government control) are authorized to review the records produced by the Provider in order to locate the things particularly described in this Warrant.

**CERTIFICATE OF AUTHENTICITY OF DOMESTIC RECORDS PURSUANT TO FEDERAL RULES OF EVIDENCE 902(11) AND 902(13)**

I, ________________________________, attest, under penalties of perjury by the laws of the United States of America pursuant to 28 U.S.C. § 1746, that the information contained in this certification is true and correct. I am employed by AT&T Wireless, and my title is ____________________________. I am qualified to authenticate the records attached hereto because I am familiar with how the records were created, managed, stored, and retrieved. I state that the records attached hereto are true duplicates of the original records in the custody of AT&T Wireless. The attached records consist of ______________ **[GENERALLY DESCRIBE RECORDS (pages/CDs/megabytes)]**. I further state that:

a. all records attached to this certificate were made at or near the time of the occurrence of the matter set forth by, or from information transmitted by, a person with knowledge of those matters, they were kept in the ordinary course of the regularly conducted business activity of AT&T Wireless, and they were made by AT&T Wireless as a regular practice; and

b. such records were generated by AT&T Wireless electronic process or system that produces an accurate result, to wit:

1. the records were copied from electronic device(s), storage medium(s), or file(s) in the custody of AT&T Wireless in a manner to ensure that they are true duplicates of the original records; and

2. the process or system is regularly verified by AT&T Wireless, and at all times pertinent to the records certified here the process and system functioned properly and normally.

I further state that this certification is intended to satisfy Rules 902(11) and 902(13) of the Federal Rules of Evidence.

________________________ ____________________________________________

Date Signature